UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

COURTNEY LOSSMANN and BRIAN RICHARD, on behalf of their minor child, A.R.,

Plaintiff

v.

THE SAGE INTERNATIONAL SCHOOL OF BOISE, A PUBLIC CHARTER SCHOOL, INC.,

Defendant.

Case No. 1:18-cv-00412-BLW

MEMORANDUM DECISION AND ORDER

## INTRODUCTION

Plaintiffs bring a Title IX claim on behalf of their daughter, A.R., a high school student at Sage International School of Boise. Plaintiffs allege that Sage violated Title IX by inadequately responding to A.R.'s report that another student had sexually assaulted her off campus. Without doubt, Sage's response could have been better. But absent a "clearly unreasonable" response to the sexual assault – something more than a school's failure to follow its own policies, as is the case here – the plaintiff is without a legal remedy under Title IX. The Court will therefore grant Sage's Motion for Summary Judgment. Dkt. 22.

## BACKGROUND

On January 3, 2018, N.J. sexually assaulted A.R. Both were eleventh graders at Sage International School and were dating at the time. On the evening of the assault, they were watching a movie at N.J.'s house and sitting on a couch when N.J asked A.R. to remove her shirt. A.R. refused, and N.J. repeated the request. When A.R. continued to refuse, N.J. repeated the request, tried putting his hand up her shirt, and pinned A.R. to the couch where they had been watching a movie, telling her she could not leave until she took off her shirt. Fortunately, A.R. was able to get away and leave physically unharmed. Their brief relationship ended soon after. *See A.R. Dec.*, Dkt. 30

On March 6, 2018,[1] A.R. disclosed the assault to Counselor Jennifer Hart, who worked at Sage. *Hart Aff.* ¶ 2, Dkt. 23; *A.R. Dec.* ¶ 2, Dkt. 30. A.R. explained she had been feeling uncomfortable and concerned since the assault because N.J. had been giving her dirty looks and had been interacting with her friends. *Hart Aff., Ex. A,* ¶¶ 2-4, Dkt. 23. Hart encouraged A.R. to tell her mother and offered to tell her if A.R. was reluctant. *Id.* ¶ 6. Hart also explained Sage's policies required that she break confidentiality to report the assault to Principal Webb and she gave A.R. a harassment form to fill out. *Id.*; *Rainey Dec. Ex. J,* at 44:21-46:25, Dkt. 27-4. Later that day,[2] A.R., Hart, and Webb met to

[1] This date is disputed. Ms. Hart says the event occurred on March 8, while plaintiff says it was March 6. *See Hart Aff.* ¶2, Dkt. 23. The difference does not appear to be particularly relevant, but, for purposes of summary judgment, the Court will accept plaintiff's position – that A.R. disclosed the event to Ms. Hart on March 6. *See A.R. Dec.* ¶ 2, Dkt. 30.

[2] *See supra* n.1 regarding disputed date.

discuss the assault. Webb specifically asked A.R. if N.J. had harmed her. A.R. responded "no" but explained her current discomfort. *Hart Aff.* ¶ 8, Dkt. 23; *Webb Aff.* ¶¶ 2-4, Dkt. 22-3.; *A.R. Dec.* ¶¶ 11-14, Dkt. 30. Webb explained that because the assault did not happen at school and/or during school time there was not much the school could do. She further explained that A.R. and her family could pursue something with law enforcement if they wanted. *Rainey Dec., Ex. B1*, at 9:16-21, 10:5-9, Dkt. 27-2.

On March 9, 2018, A.R.'s mother, Courtney Lossmann, sent an email to Webb about the assault and A.R.'s discomfort with being in the same class with N.J. *Webb Aff., Ex. C* at ¶ 9, Dkt. 22-3. The following Monday morning, March 12, 2018, A.R. met with Webb and Hart to discuss everything in detail. Webb asked A.R. if she had any concerns outside those reported on the harassment form. A.R. explained that N.J. was not bothering her at school. However, she indicated that since they had broken up she had been uncomfortable having class with N.J., who was "well liked" and whose mother worked at Sage. *Webb Aff.* ¶ 10; *Ex. B1 thereto*, Dkt. 22-3.

Later that day, Webb met with N.J. and his mother. During the meeting, N.J. acknowledged he had asked A.R. to remove her shirt and that this was wrong. *Webb Aff., Ex. D1* at ¶ 11, Dkt. 22-3. He described their current relationship as cordial. Webb told N.J. if the incident had happened at school there would have been severe consequences. N.J. was apologetic and saw it as a mistake that he did not plan on repeating. Webb decided not to suspend N.J.; however, she told N.J to avoid contact with A.R. for the present. *Id.* Based on this conversation, Webb was satisfied that N.J. understood why his

actions were wrong and that he would take no actions at school that would cause A.R. to feel uncomfortable or unsafe. *Id.* ¶ 13.

The next day, March 13, 2018, Webb responded to Lossmann's email from March 9th, 2018. Webb explained that the school would support A.R. to help her feel safe and comfortable at school, that they had A.R. fill out a sexual harassment form, and that she, Hart, and the school would be checking in with A.R. *Id.* ¶ 15. She reiterated that since the assault occurred outside of the school setting it was the family's decision if they wanted to pursue any legal or law enforcement options. *Id.* Lossmann responded that her family was pursuing legal action and had filed a report with the Boise Police Department (Boise P.D.) on March 12. *Id.* ¶ 16. This same day, Hart checked in with A.R. who stated she still felt uncomfortable although N.J. had made no contact other than "evil looks." *Hart Aff.* ¶ 12, Dkt. 23; *A.R.'s Dec.* ¶ 6, 20, Dkt. 30.

On March 14, 2018, Lossmann forwarded to Webb and Hart a Temporary Protective Order (TPO) against N.J., which prohibited him from knowingly remaining within 20 feet of A.R. during school hours. *Doramus Aff.* ¶ 3, Dkt. 22-4. Webb acknowledged receipt of the TPO and stated that Sage would take steps to comply. Sage measured the classrooms and concluded that in two of the five classes A.R and N.J. shared, there was sufficient space for N.J. to attend without violating the TPO. *Doramus Aff.* ¶ 3, Dkt 22-4. Hart and Webb spoke with the teachers who taught these classes to determine whether they had noticed a problem between the two. They also discussed the implications of the TPO and announced a passing protocol to keep the students separated

as required by the TPO. *Webb Aff.* ¶ 20, Dkt. 22-3; *Hart Aff.* ¶ 13, Dkt. 23.

The following day, March 15, 2018, A.R. was surprised to see N.J. in two of her classes. *A.R. Dec.* ¶ 22, Dkt. 30. Sage had not informed her of the passing protocol it developed in order to comply with the TPO. *Id.* A.R. visited Hart's office and informed Hart that her mom had called the police and obtained a TPO against N.J. They discussed how A.R. was doing at school—she still felt uncomfortable and was concerned seeing N.J. talk to her friends—and Hart counseled A.R. on how to deal with these feelings and reminded A.R. to visit her office anytime. *Hart Aff.* ¶ 14, Dkt. 23; *A.R. Dec.* ¶¶ 4, 6, 20-22, Dkt. 30.

The same day, A.R.'s parents met with Co-Principal Micah Doramus, who was also Sage's Title IX Coordinator, to discuss their concerns about compliance with the TPO. Doramus explained they had measured the classes and removed N.J. where the twenty-foot limitation could not be maintained. A.R.'s parents were dissatisfied with this solution, and, having consulted with counsel earlier that day, Doramus agreed that during the TPO it would be best to have N.J. attend his classes remotely. Thus, from that that point forward, until the TPO expired on March 28, 2018, N.J. attended all classes he shared with A.R. remotely. A.R.'s parents were satisfied with this plan. *See Doramus Aff.* ¶ 5, Dkt. 22-4. Doramus also met with N.J. and his parents on March 15 to discuss the TPO and the school's plans. *Id.* ¶ 4. Webb sent an email to N.J.'s parents confirming that N.J. would attend classes remotely and scheduled a follow-up meeting for the morning of Monday, March 19. *Webb Aff.* ¶ 21, Dkt. 22-3.

On March 16, 2018, Lossmann emailed the school board about her concerns and asked for help in understanding Sage's sexual harassment policies and grievance procedures. *Lossmann Dec., Ex.* A, Dkt. 27-5. Lossmann believed that by filling out the sexual harassment form Webb had provided, A.R. had sufficiently triggered a formal Title IX investigation under Sage's sexual harassment policies. *Id.* Sage's sexual harassment policy provides: "students who believe they may have been sexually harassed or intimidated should contact a counselor, teacher, Title IX coordinator or administrator *who will assist them in the Civil Rights Grievance process*." *Rainey Dec.*, Ex. F, Dkt. 27-5 (emphasis added). No Sage administrator explained to A.R.'s family that a grievance needed to be filed in order to invoke a Title IX investigation; because they had not filed a grievance, no investigation was initiated. *Id.*

On March 19, 2018, Sage's board met. Doramus, who as Title IX Coordinator had the responsibility of knowing when the policies were invoked, was at this meeting. Following the meeting, the board told A.R. and her parents that since the "alleged incident occurred outside of Sage International, Sage's sexual harassment policies are not invoked." *Rainey Dec., Ex. H*, Dkt. 27-4. (Later, on March 11, 2019, Doramus testified that Title IX recognizes that off-campus conduct can have on-campus consequences that Sage is required to address; but, at the time, the board's statement remained unclarified. *Rainey Dec., Ex. C,* at 59:12-60:5.) Later that evening, Webb sent an email to A.R's parents apologizing for missing the meeting and said they should contact her if they had any concerns or would like to schedule a meeting. *Webb Aff.* ¶ 22, Dkt. 22-3.

On March 20, 2018, Officer Rudy Hill of the Boise P.D. arrived at Sage and spoke with Webb. He explained that the Boise P.D. had received a call from A.R.'s mother claiming N.J. had violated the TPO. Sage provided copies of video surveillance from that morning to Hill for review. Sage did not hear back from Hill indicating whether the TPO had been violated. *Id.* ¶ 23. The same day, A.R. visited Hart. She explained that her mother had called the Boise P.D. when A.R. informed her that N.J. had walked by her near her locker. She said N.J. did not stop or talk to her and acknowledged that she did not think N.J. would hurt her. But she believed he was trying to win over her friends, which made her uncomfortable. Hart counseled A.R. through some of her emotions. *Hart Aff.* ¶ 15; *A.R.'s Dec.* ¶¶ 23-25, Dkt. 30.

Because of the March 20 locker incident, Lossmann informed Webb that A.R. would not be attending school on March 21 and 22 "due to Sage's inability to ensure her safety." *Webb Aff.* ¶ 27*, Ex. L thereto*, Dkt. 22-3. Lossmann informed the board about this violation, to which Executive Director Donahue emailed the board of directors and stated: "we have asked, and are not aware of any alleged instances of harassment taking place on school grounds." *Lossmann Dec., Ex. C*, Dkt. 27-5. Lossmann held A.R. out of school on the 26th for the same reasons. After consulting with legal counsel for both A.R.'s family and Sage, a written passing period protocol was prepared and sent to the parties to ease Lossmann's concerns. *Webb Aff.* ¶ 27, *Ex. M thereto*.

On March 28, 2018, the TPO was dismissed, the state having found that there was no "immediate and present danger." *Rainey Dec., Ex. A thereto*, Dkt. 27-2. Lossmann

inquired what protocols would be taken by Sage following the expiration of the TPO. *Webb Aff.* ¶ 29*, Ex. O thereto*, Dkt. 22-3.

The following day, N.J's father, Scott Jackson, sent an email to Webb discussing his concerns about some representations Lossmann had made to the Court regarding the TPO. He believed that both N.J. and Sage had followed the TPO's requirements. Based on her conversations with N.J.'s parents, Webb believed they felt N.J's right to attend school was not being fully considered. This was a concern to N.J.'s father because he felt his son had done nothing wrong at school. *Webb Aff.* ¶ 31*, Ex. Q thereto*, Dkt. 22-3.

Later that morning, Sage issued a Student Supervision Plan for N.J. and A.R. to help A.R. feel comfortable at school, while allowing N.J. to continue his education. *Id.* ¶ 32*, Ex. R thereto*. This plan permitted N.J. to attend all his classes (though seated as far away from A.R. as possible) and required heightened supervision of A.R. and N.J. during passing periods to assure the students would have minimal contact with each other. *Id.*

A.R.'s parents, dissatisfied with Sage's handling of the entire affair, withdrew A.R. from Sage on April 2, 2018. *Walther Aff.*, *Ex. B* at 53:4-54:3, Dkt. 22-5; *Rainey Dec., Ex. B*, at 16-18, Dkt. 27-2.

**LEGAL STANDARD**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party

must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

**ANALYSIS**

Title IX states that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). The statute provides victims of sex discrimination with a private right of action against recipients of federal education funding. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979). Under the United States Supreme Court's decision in *Davis v. Monroe County Board of Education,* 526 U.S. 629, 640 (1999), however, a school may be held liable in money damages under Title IX "only for its own misconduct," i.e., only when it "subjects its students to harassment." (internal quotation marks and alterations omitted). Under this standard, a plaintiff bringing a Title IX claim arising from student-on-student sexual harassment must establish the following elements:

First, the school must have "exercise[d] substantial control over both the harasser

and the context in which the ... harassment occur[ed].” *Id.* at 645.

Second, the plaintiff must have suffered harassment “that is so severe, pervasive, and objectively offensive that it can be said to deprive [the plaintiff] of access to the educational opportunities or benefits provided by the school.” *Id.* at 650.

Third, the school must have had “actual knowledge of the harassment,” meaning that a school official “who at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [school’s] behalf ha[d] actual knowledge of [the] discrimination.” *Reese v. Jefferson Sch. Dist.*, 208 F.3d 736, 739 (9th Cir. 2000) (internal quotation marks omitted); *see also Davis*, 526 U.S. at 650.

Fourth, the school must have acted with “deliberate indifference” to the harassment, meaning that the school’s “response to the harassment [was] clearly unreasonable in light of the known circumstances.” *Davis*, 526 U.S. at 643, 648.

Fifth, the school’s deliberate indifference must have subjected the plaintiff to harassment; that is, it must have caused the plaintiff to undergo harassment or made the plaintiff “‘liable or vulnerable’ to it.” *Id.* at 645 (citation omitted).

Of these five elements, Plaintiffs argue that (1) Sage’s failure to follow its sexual harassment policy constituted “deliberate indifference” to a known violation of Title IX; and (2) N.J.’s mere presence on campus created an environment “that is so severe, pervasive, and objectively offensive that it can be said to deprive [the plaintiff] of access to the educational opportunities or benefits provided by the school” or a “hostile environment” in violation of Title IX. *Davis*, 526 U.S. at 643, 648.

### 1. Deliberate Indifference

First, the Plaintiffs argue that Sage's failure to follow its sexual harassment policy constituted "deliberate indifference." Despite this failure, Sage's actions did not constitute "deliberate indifference" because it took multiple reasonable steps in response to the harassment and thus, "[was not] clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 643, 648. While the Plaintiffs' briefing does not clearly describe what would have occurred had Sage invoked the Civil Rights Grievance process mentioned in their sexual harassment policy, *see Response Br.*, Dkt. 27, I infer from the record that this would have at least involved a formal Title IX investigation, *see Ex. G to Rainey Dec.*, Dkt. 27-4.

However, deliberate indifference is a more "exacting standard," *Lopez v. Regents of Univ. of California*, 5 F. Supp. 3d 1106, 1122 (N.D. Cal. 2013). It requires showing a response that was more deficient than merely "negligent, lazy, or careless." *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006); *see also Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011) ("Title IX does not require flawless investigations or perfect solutions."). Rather, a plaintiff must plead facts that support a plausible inference that the school made what amounts to "'an official decision . . . not to remedy the violation.'" *Oden*, 440 F.3d at 1089 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)); *accord Doe v. Willits Unified Sch. Dist.*, 473 Fed. Appx. 775, 776 (9th Cir. 2012). This does not involve second guessing disciplinary decisions. *Davis*, 526 U.S. at 648.

While technical non-compliance with federal regulations or school policies and procedures does not give rise to a private right of action, "at some point, a decision to act contrary to established policy incorporating administrative guidelines on Title IX compliance seems clearly unreasonable."[3] *Karasek v. Regents of Univ. of California*, 226 F. Supp. 3d 1009, 1031 (N.D. Cal. 2016). Yet, as illustrated in *Karasek,* a school's failure to communicate its decision not to initiate a formal investigation does not amount to deliberate indifference. *Karasek*, 226 F. Supp. 3d at 1017.

In *Karasek*, the plaintiffs brought a Title IX action alleging that their university acted with deliberate indifference in responding to students' complaints of sexual assault. After reporting her assault by another student to university administrators who worked at the Title IX office and the Center for Student Conduct, no university administrator informed Karasek (one of the plaintiffs) how to initiate a formal investigation after deciding that the issue could be resolved without one. *Id.* at 1017. For the next eight months, the university did not contact Karasek regarding her complaint, did not provide her with updates regarding the situation, and did not consult with her as to whether an informal resolution process would suffice. *Id.* The district court dismissed the complaint, holding that the university did not act with deliberate indifference because the plaintiff did not plead facts showing that the university's actions amounted to "an official

---

[3] *See also* Catharine A. MacKinnon, *In Their Hands: Restoring Institutional Liability for Sexual Harassment in Education*, 125 Yale L.J. 2038 (2016) (arguing that the "due diligence" standard would hold schools better accountable to survivors if they failed to effectively respond to sexual violations within their purview).

decision" not to remedy the violation. *Id.* at 1031.

Although, as seen in *Karasek*, a court can make this determination, deliberate indifference is more typically a fact-intensive inquiry that often must be resolved by the trier of fact. When a school's response amounts to a "wholesale failure to employ established procedures for investigating sexual harassment complaint," a jury must determine whether the sexual harassment policies and procedures should have been invoked. *Brodeur v. Claremont Sch. District*, 626 F. Supp. 2d at 211 (citing *Chancellor v Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 709 (E.D. Pa. 2007)). Nevertheless, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Here, Sage was arguably negligent, lazy, and careless in failing to follow both its own and federal policies; however, its conduct is legally insufficient to establish deliberate indifference. *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006). A.R. was given the wrong form and Webb erred in deciding that the school's sexual harassment policies did not apply simply because the assault happened off campus and not during school time. However, such errors, even if negligent, do not amount to deliberate indifference. *Id*. Also, Sage should have involved the Title IX coordinator, Doramus, much earlier in the process. Furthermore, Sage should have assisted A.R. and her family with the Civil Rights Grievance process as their sexual harassment policy provides. Doramus also failed to correct the misperception that the sexual harassment

policy could not apply to conduct outside of a school setting. Even more concerning, when Lossmann emailed asking for help in understanding Sage's sexual harassment policies and the grievance procedures, no Sage administrator replied.

However, on balance, Sage's response was not "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 643, 648. Sage took multiple reasonable steps in response to A.R.'s complaint. These steps do not amount to "an official decision not to remedy the violation." *Oden*, 440 F.3d at 1089 (9th Cir. 2006) (internal quotation marks and alterations omitted); *accord Doe v. Willits Unified Sch. Dist.*, 473 Fed. Appx. 775, 776 (9th Cir. 2012). After hearing about A.R.'s assault, Hart followed Title IX protocol in breaking confidentiality in order to report it to Webb. Hart then continued to check in with A.R. throughout the following month. Webb met with and was in communication with both A.R., N.J., and their families. Though Webb decided not to discipline N.J., it is not for the Court to second guess this decision. *Davis*, 526 U.S. at 648. Sage complied with the TPO and instituted multiple protocols in order to accommodate A.R. and lessen her discomfort. In doing so, Sage required that N.J. attend his classes remotely, instead of A.R., during this period. Finally, Sage still attempted to accommodate A.R. after the TPO expired. Although Sage took multiple steps, which were not "perfect solutions," the law does not require such. *Sanches*, 647 F.3d at 170. As previously explained, merely acting contrary to established policies does not amount to deliberate indifference. *See Oden*, 440 F.3d at 1089. Furthermore, in this case, the assault happened once outside of a school setting, and A.R. had indicated to the counselor that

"while at school, N.J. never attempted to communicate with her or touch her or do anything else to her, other than to talk to her friends and give her dirty looks."[4] Construing the evidence in a light most favorable to the plaintiffs, the Court finds that no reasonable factfinder could conclude that Sage's actions in response to A.R.'s report were "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 643, 648.

For all these reasons, the Court concludes, as a matter of law, that Sage did not act with deliberate indifference.

**2. Hostile Environment**

Because the Court concludes Sage's actions were not deliberately indifferent, it does not need to determine whether the environment at Sage was sufficiently hostile to violate Title IX.

**ORDER**

It is ordered that Defendant's Motion for Summary Judgment (Dkt. 22) is **GRANTED**. Judgment will be entered separately.

DATED: August 8, 2019

B. Lynn Winmill
U.S. District Court Judge

[4] *See Defendant's Statement of Undisputed Facts,* Dkt. 22-2, ¶ 4 (summarizing Hart's version of her initial meeting with A.R.). Plaintiffs do not dispute these facts. *See Plaintiff's Response to Defendants' Statement of Undisputed Facts,* Dkt. 27-1, ¶ 4.